IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**COMMON CAUSE NEW YORK**, as an organization and on behalf of its members; **BENJAMIN BUSCHER**; **SEAN HENNESSEY**; **REBECCA LIBED**; **ANDREW GERALD**; **SUSAN MILLER**; and **SARAH MILAM**;

        Plaintiffs,

and

**UNITED STATES OF AMERICA**,

        Plaintiff-Intervenor,

    v.

**BOARD OF ELECTIONS IN THE CITY OF NEW YORK**; **MARIA R. GUASTELLA**, **FREDERIC M. UMANE**, **JOSE MIGUEL ARAUJO**, **JOHN FLATEAU**, **LISA GREY**, **MICHAEL MICHEL**, **MICHAEL A. RENDINO**, **ALAN SCHULKIN**, **SIMON SHAMOUN**, **ROSANNA VARGAS**, in their official capacities as Commissioners of the Board of Elections in the City of New York; and **MICHAEL J. RYAN**, in his official capacity as the Executive Director of the Board of Elections in the City of New York,

        Defendants.

Case No. 1:16-cv-06122-NGG-RML

## COMPLAINT IN INTERVENTION

The United States of America, as Plaintiff-Intervenor, alleges:

1. The Attorney General hereby files this complaint on behalf of the United States of America to enforce the provisions of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action pursuant to 52 U.S.C. § 20510(a) and 28 U.S.C. §§ 1331 and 1345.

3. Venue is proper in this district pursuant to 28 U.S.C. §§ 112(c) and 1391(b).

## PARTIES

4. Plaintiff-Intervenor United States of America seeks declaratory and injunctive relief pursuant to Section 11 of the NVRA, which authorizes the Attorney General to bring suit to enforce this federal statute. 52 U.S.C. § 20510(a).

5. Defendant Board of Elections in the City of New York ("the NYCBOE") is the Board of Elections for the five counties which comprise New York City. The NYCBOE is responsible for activities undertaken in its borough offices in each of those counties and for ensuring that those activities are conducted in compliance with federal and state laws. N.Y. Elec. Law §§ 3-200, 3-212, 3-214, 3-216, 3-300.

6. The NYCBOE is responsible for, among other things, voter registration, voter enrollment, and cancellation of registration. N.Y. Elec. Law §§ 5-200 *et seq.*, 5-300 *et seq.*, 5-400 *et seq.*, 5-500 *et seq.*, 5-600 *et seq.*, 5-700 *et seq.* Adding, changing, canceling, or removing voter registration records is conducted in New York only by local boards of elections, such as the NYCBOE. N.Y. Elec. Law § 5-614(4). The NYCBOE is obligated to comply with the NVRA. 52 U.S.C. § 20507.

7. Defendant Frederic M. Umane is the President of the NYCBOE and a Commissioner of Elections for the NYCBOE and is named only in his official capacity.

8. Defendant Rosanna Vargas is the Secretary of the NYCBOE and a Commissioner of Elections for the NYCBOE and is named only in her official capacity.

9. Defendants Jose Miguel Araujo, John Flateau, Lisa Grey, Michael Michel, Michael A. Rendino, Alan Schulkin, Simon Shamoun, and Maria Guastella are Commissioners of Elections for the NYCBOE and are named only in their official capacities.

10. Defendant Michael J. Ryan is Executive Director of the NYCBOE and is named only is his official capacity.

## CAUSE OF ACTION: VIOLATIONS OF SECTION 8 OF THE NATIONAL VOTER REGISTRATION ACT, 52 U.S.C. § 20507

### Voter List Maintenance Requirements under the NVRA

11. The NVRA was enacted in 1993 "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal Office" while "ensur[ing] that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(1), (4).

12. Section 8 of the NVRA ("Section 8") addresses state voter list maintenance procedures for federal elections. It prescribes the conditions under which voters may be removed and the procedures states must follow before making those removals. 52 U.S.C. § 20507.

13. Programs to maintain accurate and current voter registration lists must be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965. 52 U.S.C. § 20507(b)(1).

14. Programs to maintain accurate and current voter registration lists may not remove voters solely by reason of a voter's failure to vote. 52 U.S.C. § 20507(b)(2).

3

15. Section 8 permits States to remove the name of a person from the voter registration rolls upon the request of the registrant, and, if State law so provides, for mental incapacity or for criminal conviction. 52 U.S.C. § 20507(a)(3)(A)-(B).

16. Section 8 also requires States to conduct a general voter registration list maintenance program that makes a reasonable effort to remove ineligible persons from the voter rolls by reason of the person's death, or a change in the residence of the registrant outside of the jurisdiction, in accordance with procedures set forth in the NVRA. 52 U.S.C. § 20507(a)(4).

17. Section 8 further specifies the two circumstances under which a state may remove persons from the voter rolls by reason of a change of residence of the registrant outside the jurisdiction. 52 U.S.C. § 20507(d)(1).

18. First, a State can remove the name of a person from the voter registration list on grounds of change of residence based upon the voter's written first-hand confirmation of a change of address to a location outside of the registrar's jurisdiction. 52 U.S.C. § 20507(d)(1)(A).

19. Second, a State can remove the name of a person from the voter registration list on grounds of change of residence based upon reliable second-hand information indicating a change of address outside of the jurisdiction, but may do so only after two other conditions are met:

    a. The person fails to respond to a specific confirmation notice sent by the State. 52 U.S.C. § 20507(d)(1)(B)(i). Such confirmation notice must be a postage prepaid and preaddressed return card sent by forwardable mail, on which the registrant may state his or her current address, and which contains specific instructions and information. 52 U.S.C. § 20507(d)(2); and,

4

      b.    The person then fails to vote or appear to vote during the period ending on the day after the second federal general election subsequent to the confirmation notice being sent. 52 U.S.C. § 20507(d)(1)(B)(ii).

20.    Section 8 provides an example of a source of reliable second-hand information indicating a change of address outside the jurisdiction: change of address information supplied by the United States Postal Service through its National Change of Address ("NCOA") program. 52 U.S.C. § 20507(c)(1)(A). Other possible examples of reliable second-hand information indicating a change of address could include States undertaking a uniform mailing of a voter registration card, sample ballot, or other election mailing to all voters in a jurisdiction, for which the State could use information obtained from returned non-deliverable mail.

21.    Section 8 requires States to complete any program, the purpose of which is to systematically remove the names of ineligible voters from the official list of eligible voters, not later than 90 days prior to the date of a primary election or general election for federal office. 52 U.S.C. § 20507(c)(2)(A).

### Voter List Maintenance Requirements under New York State Law

22.    Under New York Election Law, there are three relevant voter registration statuses assigned to each voter registration record: active, inactive, and purged. N.Y. Comp. Codes R. & Regs. tit. 9, § 6217.9(a)(1)-(3). Active voters are listed in the official pollbook at the voter's polling place and may vote a regular ballot. *Id.* § 6217.9(a)(1). Inactive voters are not listed in the pollbook, but may cast affidavit ballots (and should lawfully be restored to active status as a result). *Id.* § 6217.9(a)(2). Finally, "purged" or "cancelled" voters are not qualified to vote. *Id.* § 6217.9(a)(3).

23. A purged or cancelled voter is a voter who has been removed from the voting rolls for purposes of Section 8 of the NVRA.

24. New York Election Law provides that a board of elections shall cancel a voter's registration if, since the time of his or her last registration, the voter has died or has moved his residence outside the city or county in which he or she is registered. N.Y. Elec. Law § 5-400(a), (e).

25. New York Election Law does not permit boards of elections to remove a voter from the voter registration rolls for failure to vote unless the voter had been in "inactive" status for two federal general elections. N.Y. Elec. Law § 5-400(f). Further, a board of elections may only place a voter in "inactive" status after sending the voter a confirmation notice, which, in turn, may only be sent to voters after the board of elections receives certain types of second-hand information—such as returned mail or a NCOA notice—indicating that the voter's address has changed to an address outside of the city or county in which he or she is registered. N.Y. Elec. Law §§ 5-213(1); 5-712(1)-(2).

### Ad Hoc Voter Removal Project in Brooklyn Borough Office, 2013-2015

26. In December 2013, the New York City Department of Investigation ("DOI") reported that some deceased persons, felons, and nonresidents remained on NYCBOE voter rolls even though they were no longer eligible to vote in New York City.

27. The DOI report criticized some of NYCBOE's list maintenance practices and recommended that the NYCBOE review existing cancellation procedures to see if those procedures could be improved.

28. In late 2013 or early 2014, the Chief Clerk of the Brooklyn Borough Office of the NYCBOE ("the Chief Clerk"), met with the Deputy Clerk and other supervisory staff members of the Brooklyn Borough Office to devise a plan to "clean up" the voter rolls in Kings County.

29. The Chief Clerk initiated this "clean up" plan with the intent to remove from the voting rolls any active status voters who had not voted since 2008 and whose voter registration record contained no other activity since 2008.

30. The Brooklyn Borough Office obtained an electronic file containing a list of all registered voters in Kings County from the NYCBOE Management Information Systems Department ("MIS"), which serves as the NYCBOE's information technology department.

31. At the direction of the Chief Clerk, the list of registered voters in Kings County was filtered to include voters who had not voted since 2008. The filtered list – which contained more than 122,000 voters – was then exported into a printable format.

32. Supervisory staff members of the Brooklyn Borough Office distributed printed portions of that filtered list to Brooklyn Borough Office staff members. Using those lists, a Brooklyn Borough Office staff member who was a member of one major political party would search for a voter's name in the NYCBOE's local computerized voter registration database, called Archival for Voter Images and Data ("AVID").

33. Within the AVID system, the staff member looked for any recent activity in the voter's record, such as a change of address, or a change of name, or a request for an absentee ballot.

34. If there was no recent activity in the voter's record, that staff member would mark the voter to be "flagged." A staff member who was a member of the other major political party would then review the first staff member's determination.

7

35. Where the staff members of the two major political parties agreed there was no activity in a voter's registration record since 2008, the second staff member would "flag" the voter within the AVID system using an application called INFO66 ITC.

36. "Flagging" a voter using INFO66 ITC indicated that the individual voter's registration would later be cancelled by the MIS Department.

37. Upon information and belief, many of the voters flagged for removal were in active registration status and had therefore never been sent a confirmation notice since the time of their last registration.

38. Upon information and belief, the criteria that the Chief Clerk and other Brooklyn Borough Office staff members used to target voters for cancellation did not include the number of federal elections that had taken place since the sending of a confirmation notice predicated on reliable second-hand information of a relevant change of address.

39. Upon information and belief, the Chief Clerk and other Brooklyn Borough Office staff members did not conduct any individualized determinations of whether any of the targeted voters had died or moved out of the jurisdiction based upon reliable first-hand information.

40. Upon information and belief, most of the voters targeted had not voted in any election since 2008. However, over 4,100 of the voters targeted had in fact voted since 2008, indicating that they were targeted based upon other unknown criteria, or were inadvertently targeted.

41. Brooklyn Borough Office staff members carried out this process—which included a staff member of one major political party searching for a voter's record, locating the record, and flagging the record for removal after obtaining agreement from a staff member of the other

major political party as to the lack of activity by the voter since 2008—for over 122,000 voters, one voter at a time, on a daily basis for over a year.

42. Flagging a voter using INFO66 ITC did not immediately cancel a voter's registration in the AVID system. Instead, each voter flagged was first sent an Intent to Cancel ("ITC") notice.

43. New York Election Law requires boards of elections to mail an ITC notice to a voter in certain situations. An ITC notice states that the NYCBOE intends to cancel the voter's registration and gives the voter 14 days to respond. N.Y. Elec. Law § 5-402(2).

44. An ITC notice does not meet the requirements for a confirmation notice as set forth in Section 8 of the NVRA. 52 U.S.C. § 20507(d)(2).

45. An ITC notice is not a "confirmation notice" under New York State law. N.Y. Elec. Law § 5-712.

46. Although the Brooklyn Borough Office staff members manually "flagged" over 122,000 voters for cancellation using the INFO66 ITC application throughout 2014 and into the spring of 2015, the NYCBOE did not mail any ITC notices for these flagged voters until after the May 2015 federal special election held in Brooklyn.

47. On May 26, 2015, the NYCBOE sent ITC notices to a subset of the list of flagged voters in Brooklyn.

48. In or around June of 2015, the NYCBOE sent ITC notices to another subset of flagged voters.

49. Brooklyn Borough Office staff members did not mail the ITC notices to these flagged voters. Instead, due to the unusually large number of ITC notices to be mailed, the MIS

department and staff members working in the Voter Registration Department of the central office of the NYCBOE were responsible for handling these bulk mailings.

50. In total, approximately 4,470 voters of the approximately 122,000 voters who were sent an ITC notice in May and June of 2015 responded to the ITC notice. Brooklyn Borough Office staff members processed these responses, and removed these voters from the list of flagged voters. Accordingly, this group of voter registrations targeted by the Brooklyn Borough Office was not cancelled.

51. Once the ITC mailings were complete, the MIS Department performed a global bulk update of each flagged voter's registration status in AVID, which updated these voters' registration statuses to cancelled.

52. Voters who did not respond to the May 26, 2015 ITC notice were cancelled through a global bulk update on June 18, 2015. Voters who did not respond to the June 2015 ITC notice were cancelled through a global bulk update on July 5, 2015.

53. In total, approximately 117,000 voters did not respond to the ITC notices and had their status changed to "cancelled" in the AVID database on June 18 and July 5, 2015.

54. Once the global bulk update of the 117,000 AVID records was complete, under the normal AVID process, all of these voter status changes should have been sent to NYSVoter, New York's statewide voter registration database.

55. NYSVoter is a "bottom-up" statewide voter registration database administered by the New York State Board of Elections ("SBOE"). That system permits each New York county to conduct list maintenance activities within its local voter registration database (such as AVID in New York City), then transfer data to NYSVoter, the statewide registration database.

56. New York Election Law's implementing regulations require that county voter registration systems must synchronize with NYSVoter at least every 24 hours. N.Y. Comp. Codes R. & Regs. tit. 9, § 6217.4(b).

57. Instead, all but a small number of these 117,000 voter registration status changes in AVID failed to timely upload to NYSVoter.

58. It was not until at least six months later, in the first quarter of 2016, that NYCBOE and SBOE officials discovered this discrepancy between the voters' registration statuses in the AVID database and the NYSVoter database. The NYCBOE and SBOE then took steps to remedy the failure of approximately 117,000 voter registration status changes in AVID to upload to NYSVoter.

59. As a result, for more than six months, the AVID and NYSVoter databases contained conflicting information about the status of 117,000 voter records. In AVID, those voter records indicated that each voter's registration was cancelled; in NYSVoter, those voter records indicated the voter's prior registration status.

60. The failure of the AVID and NYSVoter databases to synchronize for almost six months had several negative consequences for both ordinary voters and elections administrators.

61. First, the SBOE website provides a voter registration search tool that allows registered voters to confirm their voter registration status and look up their polling place. The information contained in the search tool is generated from the NYSVoter database.

62. As a result, the failure of the AVID and NYSVoter databases to synchronize for almost six months prevented affected voters who used the SBOE voter lookup tool during this period from obtaining accurate information about the status of their voter registration.

63. Second, the SBOE publishes voter enrollment statistics by county and status in April and November of each year. The data are generated from the NYSVoter database. Because the 117,000 voter records at issue were not updated in NYSVoter until early 2016, the April 1, 2016 SBOE voter enrollment statistics was the first public report indicating that the voting rolls had dropped significantly in Brooklyn (based on the purge of 117,000 voters).

64. The cancellation of these 117,000 voters caused Kings County to report an 8% decrease in total active registered voters between November 2015 and April 2016, the largest percentage decrease of any county in the State.

65. The failure of the AVID and NYSVoter databases to synchronize for almost six months impaired the ability of the SBOE, the NYCBOE, and the general public to obtain timely and accurate information about the decrease in total active registered voters from the SBOE's voter enrollment statistics until the eve of the April 2016 presidential preference primary election.

66. On or around April 19, 2016, the date of New York State's presidential preference primary election, local news outlets made inquiries to the NYCBOE regarding the large reported drop in total active registered voters contained in the SBOE's April 1 voter enrollment statistics, which in turn prompted NYCBOE Executive Management to examine the reasons for the cancellation of the approximately 117,000 voter registrations.

67. After the April 19, 2016 election had taken place, the NYCBOE determined that the cancellation of the approximately 117,000 voter registrations was contrary to NYCBOE policy, state law, and federal law. The NYCBOE compared affidavit ballots cast during the April 19, 2016 election against the list of 117,000 cancelled voter registrations with the intent of counting affidavit ballots cast by such voters. The NYCBOE's Executive Director later testified

that the NYCBOE has taken steps aimed at reinstating the 117,000 cancelled voter registrations to their prior registration status.

68. On information and belief, the voter removal program as set forth in paragraphs 26-67 was applied only to voter registration records containing a residential address in Kings County, and was not applied to voter registration records containing a residential address in other counties that comprise New York City.

### NYCBOE Oversight of Borough Voter Removal Programs

69. No single NYCBOE employee or NYCBOE department is responsible for directing or monitoring list maintenance activity across the entire jurisdiction of New York City to ensure uniformity and compliance with the requirements of Section 8 of the NVRA.

70. NYCBOE list maintenance activities are overseen and executed primarily by individual borough office staff members and members of the MIS Department, including information technology contractors.

71. The NYCBOE does not provide borough office staff members and members of the MIS department with adequate or regular training regarding their obligation to comply with the list maintenance requirements of Section 8 of the NVRA. As a result, many NYCBOE borough office staff members and members of the MIS Department responsible for performing list maintenance activities lack relevant knowledge of their obligations under Section 8 of the NVRA.

72. The NYCBOE lacks adequate systems, procedures, and processes for directing, monitoring, and reporting on individual NYCBOE borough offices' compliance with the requirements of Section 8 of the NVRA.

73. The NYCBOE lacks a comprehensive plan for implementing a general list maintenance program in New York City that complies with the requirements of Section 8 of the NVRA.

74. The deficient oversight of borough voter removal programs set forth in paragraphs 69-73 was a cause of the unlawful removals of voters from the voter rolls set forth in paragraphs 26-68.

75. Unless enjoined by this Court, the deficient oversight of borough voter removal programs set forth in paragraphs 69-73 is likely to result in the same or similar unlawful removals of voters from the voter rolls set forth in paragraphs 26-68.

76. Unless enjoined by this Court, the deficient oversight of borough voter removal programs set forth in paragraphs 69-73 is likely to result in the untimely detection and/or correction of the same or similar unlawful removals of voters from the voter rolls set forth in paragraphs 26-68.

## Violations of Section 8 of the NVRA

77. Defendants' actions violated the NVRA's requirement that programs to maintain accurate and current voter registration lists may not remove voters solely by reason of a voter's failure to vote. 52 U.S.C. § 20507(b)(2).

78. Defendants' actions violated the NVRA's requirement that a voter to be removed on grounds of a change of residence based upon reliable second-hand information indicating a change of address outside of the jurisdiction may only be removed if the voter fails to respond to a specific confirmation notice. 52 U.S.C. § 20507(d)(1)(B)(i).

79. Defendants' actions violated the NVRA's requirement that a voter to be removed on grounds of a change of residence based upon reliable second-hand information indicating a

change of address outside of the jurisdiction may only be removed if the voter fails to vote or appear to vote during the period ending on the day after the second federal general election subsequent to the confirmation notice being sent. 52 U.S.C. § 20507(d)(1)(B)(ii).

80. Defendants' actions violated and continue to violate the NVRA's requirement that programs to maintain accurate and current voter registration lists must be uniform and nondiscriminatory. 52 U.S.C. § 20507(b)(1).

81. Defendants' actions violated and continue to violate the NVRA's requirement that the State conduct a general program that makes a reasonable effort to remove the names of eligible voters by reason of the death of the registrant or by reason of a change in the residence of the registrant in accordance with the requirements set forth in Sections 8(b)-(d) of the NVRA. 52 U.S.C. § 20507(a)(4).

82. Unless and until ordered to do so by this Court, the Defendants will not take timely and comprehensive actions necessary to fully remedy the violations and prevent the same or similar violations from recurring.

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that the Court enter an ORDER:

(1) Declaring that Defendants have violated Section 8 of the NVRA;

(2) Enjoining Defendants, their agents and successors in office, and all persons acting in concert with them from future non-compliance with Section 8 of the NVRA;

(3) Requiring Defendants, their agents and successors in office, and all persons acting in concert with them, to take all steps necessary to ensure immediate and ongoing compliance with Section 8 of the NVRA; and

(4) Ordering any such additional relief as the interests of justice may require, together with the costs and disbursement in maintaining this action.

Date: January 18, 2017

                                                  Respectfully submitted,

| | |
|---|---|
| ROBERT L. CAPERS | VANITA GUPTA |
| United States Attorney | Principal Deputy Assistant Attorney General |
| Eastern District of New York | Civil Rights Division |
| | |
| /s/ Michael J. Goldberger | /s/ Kaycee M. Sullivan |
| MICHAEL J. GOLDBERGER | T. CHRISTIAN HERREN, JR |
| Chief of Civil Rights | RICHARD A. DELLHEIM |
| Civil Division | KAYCEE M. SULLIVAN |
| Eastern District of New York | ALEXANDER G. TISCHENKO |
| 271 Cadman Plaza East | Attorneys, Voting Section |
| Brooklyn, NY 11201 | Civil Rights Division |
| (718) 254-6052 | U.S. Department of Justice |
| | 950 Pennsylvania Ave., NW, NWB 7254 |
| | Washington, D.C. 20530 |
| | (202) 305-6828 |

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2017, I served a true and correct copy of the foregoing via the Court's ECF system on the following counsel of record:

May K. Chiang
Mauricio Alejandro Espana
Jamie Rachel Hacker
Negin Hadaghian
Neil A. Steiner
Dechert LLP
1095 Avenue Of The Americas
New York, NY 10036
may.chiang@dechert.com
Counsel to Plaintiffs

Joanna Elise Cuevas Ingram
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York , NY 10013
jcuevas@latinojustice.org
Counsel to Plaintiffs

I hereby certify that on January 18, 2017, I served a true and correct copy of the foregoing via the Court's ECF system and by U.S. mail on the following counsel of record:

Stephen Edward Kitzinger
New York Law Department
100 Church Street, Room 2-126
New York, NY 10007
skitzing@law.nyc.gov
Counsel to Defendants

    /s/ Kaycee M. Sullivan
KAYCEE M. SULLIVAN
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., NW, NWB 7264
Washington, D.C. 20530
(202) 305-6828
kaycee.sullivan@usdoj.gov