**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **COMMON CAUSE NEW YORK**, as an organization and on behalf of its members; **BENJAMIN BUSCHER**; **SEAN HENNESSEY**; **REBECCA LIBED**; **ANDREW GERALD**; **SUSAN MILLER**; and **SARAH MILAM**;<br><br>Plaintiffs,[1]<br><br>v.<br><br>**BOARD OF ELECTIONS IN THE CITY OF NEW YORK**; **MARIA R. GUASTELLA**, **FREDERIC M. UMANE**, **JOSE MIGUEL ARAUJO**, **JOHN FLATEAU**, **LISA GREY**, **MICHAEL MICHEL**, **MICHAEL A. RENDINO**, **ALAN SCHULKIN**, **SIMON SHAMOUN**, **ROSANNA VARGAS**, in their official capacities as Commissioners of the Board of Elections in the City of New York; and **MICHAEL J. RYAN**, in his official capacity as the Executive Director of the Board of Elections in the City of New York,<br><br>Defendants. | **COMPLAINT IN INTERVENTION**<br><br>Case No. 1:16-cv-06122-NGG-RML |

---

[1] On January 12, 2017, the United States Department of Justice submitted a letter-motion to intervene, which was granted by this Court on January 18, 2017. ECF No. 22. The New York Attorney General filed a letter-motion to intervene on January 24, 2017, which is pending before this Court. ECF No. 27.

## PRELIMINARY STATEMENT

1.      The right to vote is a fundamental right and a hallmark of our democracy. Voter registration rolls are the gateway to exercising that fundamental right. In New York, citizens can only cast a regular ballot if their names are on the registration rolls. Thus, federal and state election laws safeguard against arbitrary, discriminatory or unfair registration policies and practices that remove voters from the rolls and threaten their access to the franchise.

2.      Since at least 2014, the New York City Board of Elections ("NYCBOE") has improperly cancelled more than 200,000 voter registrations using policies and practices that violated federal and state election laws. Officials across the NYCBOE, including several senior level managers, developed and implemented illegal policies and practices to carry out at least three large "purges" of tens of thousands of voters at a time. In doing so, the NYCBOE shortcut the procedures for cancelling voter registrations required by law and disenfranchised many voters.

3.      Over the course of 2014 and 2015, the NYCBOE improperly purged voters from its list of registered voters using two types of methods, which violated federal and state election laws.

4.      In the first purge discussed *infra*, officials in the NYCBOE, and specifically in its Brooklyn, Manhattan, and Queens Borough Offices used a method which illegally removed citizens from the registration rolls solely because those individuals did not vote.

5.      The National Voter Registration Act ("NVRA") prohibits local election authorities from removing voters from the list of eligible voters "by reason of the person's failure to vote." 52 U.S.C. § 20507(b)(2). Similarly, New York State Election Law does not permit

1

cancellation of a voter's registration solely because that individual has not voted. N.Y. Elec. Law § 5-400(1).

6.      Despite these prohibitions, starting in 2014, senior officials in the Brooklyn Borough Office of the NYCBOE devised and implemented a plan to flag registrations for cancellation based on an individual's lack of voting, or lack of other voting-related activity such as submitting changes in registration information.

7.      Staff throughout the Brooklyn Borough Office flagged more than 122,000 voter registrations for cancellation in 2014. In 2015, the NYCBOE sent a letter to each of the flagged voters informing them of the NYCBOE's intent to cancel their registration. By July 2015, the NYCBOE had purged over 117,000 voters flagged by its Brooklyn Borough Office. This purge is referred to *infra* as "The Brooklyn Project."

8.       Senior officials at the NYCBOE, known as Executive Management, were updated regularly regarding the mailing and purging of the flagged voters during the Brooklyn Project. Despite this notice, these officials failed to prevent the unlawful purge or reverse it after it was fully implemented and voters' registrations were cancelled.

9.      The Brooklyn Project was not the only instance of the NYCBOE cancelling voter registrations for failing to vote in violation of federal and state law. At the same time the Queens and Manhattan Borough Offices of the NYCBOE also engaged in the practice, again in violation of federal and state election laws.

10.     The NYCBOE also violated federal and state election laws during two additional large purges conducted in 2014 and 2015, by undertaking a policy of *immediately* cancelling the registrations of individuals who, according to the United States Postal Service ("USPS"), may

2

have moved outside of the NYCBOE's jurisdiction, rather than providing those voters with the legally required multi-year period in which to confirm their continued eligibility to vote.

11.     Both the NVRA and New York State Election Law bar local election authorities from immediately removing voters from the list of eligible voters based on change-of-address information provided by the USPS. 52 U.S.C. § 20507(c)(1)(B)(ii); N.Y. Elec. Law §§ 5-708(5)(c), 5-400(1)(f). Instead, both the NVRA and New York State Election Law require that those voters identified through the USPS's National Change of Address ("NCOA") database as possibly having moved outside New York City be given the opportunity to confirm their continued eligibility over a time span of two successive federal general elections, i.e. two to four years.

12.     In violation of these legal requirements, in both 2014 and 2015, the NYCBOE sent intent to cancel letters to voters who, based on information from the NCOA database, were believed to have moved outside New York City. Then, just 14 days after sending those letters, the NYCBOE canceled the registrations of those voters who did not respond. This practice led the NYCBOE to purge 60,000 voter registrations in 2014, and more than 43,000 voter registrations in 2015.

13.     Again, officials in NYCBOE Executive Management were regularly updated about the progress of these various illegal purges, and yet failed to exercise proper oversight to timely detect and prevent these voter purges from occurring.

14.     The New York State Attorney General brings this action to defend the right to vote in New York State and to protect voters from disenfranchisement by the NYCBOE's illegal and unfair policies and practices of cancelling voter registrations.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 52 U.S.C. § 20510(b). This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). This Court may exercise supplemental jurisdiction over claims based on New York law pursuant to 28 U.S.C. § 1367.

16.     This Court has jurisdiction to issue the declaratory relief requested pursuant to the Declaratory Relief Act, 28 U.S.C. §§ 2201, 2202. This Court may also grant injunctive relief pursuant to Federal Rule of Civil Procedure 65.

17.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) because most of the events set forth in this complaint occurred in the Eastern District of New York.

## PARTIES

18.     Plaintiff is the People of the State of New York, by its attorney, Eric T. Schneiderman, Attorney General of the State of New York ("NYAG").

19.     Where, as here, the interests, rights, and well-being of a substantial segment of the People of the State of New York are implicated, the NYAG possesses *parens patriae* authority to commence legal actions in federal court for violations of federal and state laws. The NYAG invokes his *parens patraie* authority to protect the voting rights of the People of the State of New York.

20.     The NYAG has a "unique status as the representative of the greater public good and [a] concomitant mandate to secure wide-ranging relief that will inure to the direct and indirect benefit of the broader community." *New York v. Utica City Sch. Dist.*, 177 F. Supp.3d 739, 753-

54 (N.D.N.Y. 2016). As such, the NYAG has a quasi-sovereign interest in the health and well-being of New Yorkers. A fundamental component of that well-being is New Yorkers' right to vote. The NYAG's interest in protecting its citizens' fundamental voting rights warrants the employment of the NYAG's *parens patriae* authority. *See New York v. Cnty. of Del.*, 82 F. Supp.2d 12, 13 n. 1 (N.D.N.Y. 2000) (holding that NYAG had *parens patriae* authority to bring a suit to protect the voting rights of disabled New Yorkers). The NYAG brings this action pursuant to his *parens patriae* authority on behalf of the New York voters who were unlawfully removed from the voter registration rolls and were consequently disenfranchised as a result of NYCBOE policies and practices that violated federal and state election laws.

21.    Defendant Board of Elections in the City of New York ("NYCBOE") is the Board of Elections for the five counties which constitute New York City. The NYCBOE is responsible for, among other things, voter registration, voter enrollment, registration cancellation, and other tasks related to the maintenance of the registration rolls. N.Y. Elec. Law §§ 5-200 *et seq.*, 5-300 *et seq.*, 5-400 *et seq.*, 5-500 *et seq.*, 5-600 *et seq.*, 5-700 *et seq.*

22.    The NYCBOE is obligated to comply with the NVRA, 52 U.S.C. § 20507, and New York State Election Law.

23.    The NYCBOE is made up of five Borough Offices corresponding to the five counties in New York City, and a Central Office in Manhattan in which senior officials, known as Executive Management, as well as other supervisory staff and the information technology department are located. The Borough Offices in each county manage voter registrations, voter enrollments, registration cancellations, and other tasks related to the maintenance of the registration rolls within the county. Executive Management is responsible for ensuring that

activities undertaken by its Borough Offices comply with federal and state laws.

24.     The NYCBOE has ten commissioners, two from each of the five boroughs of New York City. N.Y Elec. Law § 3-200(2).

25.     Defendant Frederic M. Umane is the President of the NYCBOE and a Commissioner of Elections for the NYCBOE and is named only in his official capacity.

26.     Defendant Rosanna Vargas is the Secretary of the NYCBOE and a Commissioner of Elections for the NYCBOE and is named only in her official capacity.

27.     Defendants Jose Miguel Araujo, John Flateau, Lisa Grey, Michael Michel, Michael A. Rendino, Alan Schulkin, Simon Shamoun, and Maria Guastella are Commissioners of Elections for the NYCBOE and are named only in their official capacities. Defendant Michael J. Ryan is Executive Director of the NYCBOE and is named only in his official capacity.

## FACTS

### I.     Federal and State Election Laws

28.     While the NVRA requires state and local election authorities to make a "reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters," the NVRA also regulates such efforts to ensure that voters are protected from unwarranted removal. 52 U.S.C. § 20507(a)(4); 52 U.S.C. § 20507(b)-(d).

29.     Similarly, New York State Election Law mandates that local Boards of Election ("local BOEs") maintain an accurate voter registration roll while simultaneously protecting voters against improper cancellations. N.Y. Elec. Law § 5-614(12)-(14).

### A.     Federal and State Law Prohibit Election Authorities from Removing Voters from the Registration Rolls Solely Because they Did Not Vote

30.     New York Election Law specifies the grounds for cancelling voter registrations.

6

These include, among others, conviction and serving sentences of imprisonment or parole for a felony, death, and adjudication as incompetent.

31.     When a local BOE believes that a voter is no longer qualified to vote on one of these grounds, it can initiate the registration cancellation process. N.Y. Elec. Law § 5-402(2).

32.     In order to start the cancellation process on one of these grounds, the local BOE must first send a letter informing the voter of the reason it believes he or she is ineligible and of its "intent to cancel" the voter's registration ("ITC letter"). The voter then has 14 days to respond to the ITC letter and verify his or her continued eligibility, or his or her registration will be cancelled. N.Y. Elec. Law § 5-402(2).

33.     However, both the NVRA and New York State Election Law bar election authorities from initiating the process to cancel a voter's registration simply because that individual did not vote. Stated differently, the failure to vote cannot trigger the start of the process to cancel a registration.

34.     The NVRA prohibits election authorities from cancelling a voter's registration based solely on that voter's "failure to vote." 52 U.S.C. § 20507(b)(2) (state programs "shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote").

35.     New York Election Law similarly does not permit BOEs to remove voters from the registration rolls based solely on a failure to vote.  N.Y. Elec. Law § 5-400(1).

36.     As described in Part III ¶¶ 57-155 *infra*, the NYCBOE violated federal and state election laws by initiating the cancellation process for voters solely because they had not voted during a period of time, and ultimately removed more than 117,000 voters from the registration

rolls on this basis.

**B.    Federal and State Law Prohibit Election Authorities from Immediately Cancelling a Voter's Registration Who They Suspect Has Changed His Or Her Address**

37.    A citizen's name may be removed from the registration rolls when that individual has changed his or her address such that he or she no longer lives within the local BOE's jurisdiction. N.Y. Elec. Law § 5-400(1)(a); 52 U.S.C. § 20507(a)(4)(ii).

38.    Pursuant to federal and state law, when a local BOE has reason to suspect that a voter has moved, the local BOE may initiate the cancellation process. However, the cancellation process for a change of address involves more steps than, for example, the process for a suspected death, conviction and sentence of imprisonment or parole for a felony, or adjudication of incompetence. *See supra* ¶¶ 30-32.

39.    The NVRA sets forth the steps that an election authority must follow to lawfully cancel a voter's registration when the authority has reason to believe that the voter has moved to a new residence outside of the authority's jurisdiction, 52 U.S.C. § 20507(c)-(d), such as when the authority receives information from the USPS's NCOA database of a change of address, 52 U.S.C. § 20507(c)(1)(B)(ii).

a.    Upon receipt of such information, the election authority must send any voter it suspects is ineligible a "postage prepaid and pre-addressed return card . . . on which the [voter] may state his or her current address." 52 U.S.C. § 20507(d)(2)(A). This is known as a "Confirmation Notice" and it is sent to the original address in the voter's registration file.

b.    If a voter fails to return the Confirmation Notice, and if he or she fails to

8

vote in an election over the next two federal general elections, the election authority may cancel the voter's registration. 52 U.S.C. § 20507(d)(1)(B)(i)-(ii).

40.     Under New York law, and consistent with the NVRA, a local BOE must remove a voter's registration from its registration rolls if the voter "moved his residence outside the city or county in which he is registered." N.Y. Elec. Law § 5-400(1)(a).

41.     Like the NVRA, New York Election Law provides that a local BOE may initiate a multi-year cancellation process when it receives information from the USPS's NCOA database that a voter has moved outside of the board's jurisdiction. New York Election Law, just like the NVRA, prohibits the local BOE from *immediately* cancelling a voter's registration, and instead directs the BOE to undertake a multi-year process.

42.     Specifically, upon receipt of information from the NCOA database suggesting that a voter may have moved outside its jurisdiction, a local BOE can begin the cancellation process by sending a Confirmation Notice to the voter, N.Y. Elec. Law § 5-712, and simultaneously placing the voter in "inactive status," N.Y. Elec. Law § 5-708(5)(c).

43.     Voters in inactive status are still eligible to vote, but their names will not appear in the poll book at their poll site during an election. A voter in inactive status must instead vote by affidavit ballot, which will be counted in an election after the local BOE verifies the voter's eligibility. N.Y. Elec. Law § 5-213(2).

44.     If a voter remains in inactive status for two successive federal general elections, the local BOE may cancel the voter's registration. N.Y. Elec. Law § 5-400(1)(f).

45.     However, a voter can convert his or her inactive status to active status by doing at least one of the following pursuant to N.Y. Elec. Law § 5-213(3): respond to a Confirmation

Notice; cast an affidavit ballot in an election; or provide the BOE with an updated registration form.

46.     Thus, both the NVRA and New York Election Law require BOEs to start the cancellation process for a voter who may have moved outside of the jurisdiction by sending a Confirmation Notice to that voter.

47.     The Confirmation Notice that must be sent to initiate the cancellation process for a voter who has moved out of the jurisdiction is different from the "ITC letter" described in ¶ 32 *supra*. The most significant difference between the two is that an ITC letter can result in cancellation if a voter does not respond within 14 days, while a Confirmation Notice results in cancellation if a voter does not respond and confirm his or her continued eligibility within the next two federal general elections, a time span lasting from two to four years. N.Y. Elec. Law §§ 5-402(2), 5-712(3); 52 U.S.C. § 20507(d)(2). Both ITC letters and Confirmation Notices must inform voters of the amount of time the voter has to respond and verify his or her continued eligibility to avoid cancellation. N.Y. Elec. Law §§ 5-402(2), 5-712(3).

48.     As described in Part IV ¶¶ 130-155 *infra*, the NYCBOE violated federal and state election laws by sending an ITC letter – instead of the legally mandated Confirmation Notice – to voters who they suspected of having moved out of the jurisdiction. The NYCBOE further violated federal and state election laws by cancelling the registration of voters who did not respond just 14 days after sending the ITC instead of giving those voters the time span of two federal general elections to confirm their continued eligibility to vote.

## II.    The NYAG's Investigation

49.     The NYAG has been investigating the NYCBOE's policies and practices for

maintaining its registration rolls since the presidential primary held on April 19, 2016. The investigation to date has revealed extensive, systemic problems in the NYCBOE's policies and procedures which caused voters – not only in Brooklyn but in all five boroughs – to be improperly removed from the registration rolls.

50.     The NYAG operated a statewide election helpline during New York's presidential primary on April 19, 2016.

51.     The helpline received hundreds of complaints alleging widespread voting irregularities across New York City, and specifically complaints that many eligible voters did not appear on the registration rolls in Brooklyn.

52.     As a result, on April 20, 2016, the NYAG launched an investigation into the NYCBOE's policies and practices for maintaining its registration rolls.

53.     As explained in more detail in Parts III and IV *infra*, the NYAG has found that the NYCBOE's policies and practices for maintaining its registration rolls resulted in purges of more than 200,000 voters from its registration rolls in 2014 and 2015.  The NYCBOE's unlawful practices removed eligible voters from the registration rolls, thus thwarting their constitutionally protected right to participate in local, state, and federal elections. Specifically:

        a.     In one large purge conducted from 2014 through 2015, the NYCBOE
        improperly initiated the cancellation process and ultimately removed 117,000 voters from
        the registration rolls in Brooklyn solely because these individuals had not voted since
        2008. The NYCBOE lacked the evidence that these voters were ineligible to vote as
        required by state election law, i.e., the NYCBOE had no reason to believe that the voter
        had died, was convicted of a felony and imprisoned or on parole, was adjudicated

incompetent, or had moved out of the jurisdiction;

      b.     The NYAG also found evidence that, just like in Brooklyn, the Manhattan and Queens Borough Offices of the NYCBOE improperly initiated the cancellation of voters' registrations solely based on failing to vote and not because of evidence that these voters were no longer eligible to vote on any of the grounds mandated by state election law. The exact number of voters purged by the Manhattan and Queens Borough Offices on this unlawful basis is not known;

      c.     In two additional large purges conducted in 2014 and 2015 of voters whom the NYCBOE actually suspected of moving outside of New York City, the NYCBOE cancelled a combined total of 100,000 voters' registrations throughout New York City by shortcutting mandated procedures and removing these voters from the registration rolls after only providing them with 14 days' notice to object to the cancellation rather than the required period covering two federal general elections, i.e., two to four years.

54.     Emails obtained by the NYAG reveal that, prior to the 2016 presidential primary, senior officials at the NYCBOE were aware that voters in Brooklyn had been illegally removed from the registration rolls due to their failure to vote.

55.     Additional emails reveal that the unlawful practice of cancelling voters' registrations for failure to vote also occurred in the Manhattan and Queens Borough Offices.

56.     Emails also reveal that staff at the NYCBOE Central Office explicitly recognized that the NYCBOE violated the law by sending ITC letters, rather than Confirmation Notices, to voters suspected of moving outside New York City and cancelling those that did not respond

within 14 days, rather providing those voters two federal general elections, a time span of two to four years, to confirm their continued eligibility.

## III.     The Purges Of Voters From Registration Rolls For Failure To Vote

57.     Beginning in 2014, the NYCBOE, specifically its Brooklyn Borough Office, developed and implemented a policy and practice of unlawfully removing voters from its registration rolls solely because they did not vote.

58.     This policy and practice was developed and carried out by senior officials in the Brooklyn Borough Office and became known as "the Brooklyn Project." *See infra* ¶¶ 62-100.

59.     NYCBOE's Executive Management and other Central Office staff were informed about the Brooklyn Project and had ample opportunity to identify and reverse the illegal cancellations, but failed to take appropriate action prior to the April 2016 presidential primary. *See infra* ¶¶ 84-113.

60.     Implementation of the Brooklyn Project resulted in the improper removal of more than 117,000 voters from the rolls. *See infra* ¶ 90.

61.     However, these policies and practices were not limited to Brooklyn. The Queens and Manhattan Borough Offices also implemented policies and practices to cancel voters' registrations for failing to vote. *See infra* ¶¶ 125-128.

### A.     The NYCBOE's Development and Implementation of the Brooklyn Project

#### i.     NYCBOE's Response to the December 2013 DOI Report

62.     The Brooklyn Project was devised in response to a report published by the New York City Department of Investigations ("DOI") in December 2013 that identified systemic problems at the NYCBOE, specifically with respect to its policies and practices for maintaining

its registration rolls.

63.     The DOI found that individuals ineligible to vote in New York City, including deceased persons, imprisoned felons and felons on parole, and nonresidents, nevertheless had active registrations on the NYCBOE's computerized voter database, known as the Archival Voter Information Database ("AVID").

64.     The DOI also found that ineligible voters appeared in poll books at poll sites during the September 2013 primary election.

65.     The DOI recommended that the NYCBOE review existing cancellation procedures to determine whether any changes could be made to improve the system for removing ineligible voters from the registration rolls.

66.     In response to the DOI's findings and recommendations, various NYCBOE officials researched new ways to identify and remove ineligible individuals from the registration rolls. For instance, the NYCBOE sought to determine whether voters in its voter database had died by using the Social Security Death Index ("SSDI"), a database of deaths reported to and maintained by the United States Social Security Administration.

67.     In addition, officials at the Queens Borough Office obtained a subscription to Ancestry.com, a private website containing family history data, and used the website to determine whether voters had died.

68.     In late January 2014, officials from the Queens Borough Office described the practice of using Ancestry.com to the Coordinator of Voter Registration and officials in Executive Management including the Executive Deputy Director.

69.     These officials did not curtail or halt the practice of using Ancestry.com at that

time.

### ii.    Brooklyn Borough Office's Plan to "Clean Up" Its Rolls

70.    In late 2013 or early 2014, the Chief Clerk of the Brooklyn Borough Office ("Chief Clerk") of the NYCBOE met with the former manager of the Voter Registration Department in Brooklyn, also known as the "AVID Supervisor," to devise a plan to "clean up" the Borough's registration rolls.

71.    The former AVID Supervisor suggested that the Brooklyn Borough Office create a policy to remove individuals from the registration rolls who (a) had not voted since 2008 and (b) had no other activity recorded in AVID since 2008, such as change of address, name, or party affiliation.

72.    The AVID Supervisor selected 2008 as the benchmark because two presidential elections had taken place since that time. The AVID Supervisor surmised that individuals who did not vote during presidential elections, which generally have higher voter turnouts, had likely moved or were otherwise no longer eligible to vote. However, this was just an assumption and the Brooklyn Borough Office did not have evidence of lawful grounds to initiate the cancellation process, i.e., that the voters had died, were in prison or on parole for a felony, were adjudicated incompetent or had moved outside of the jurisdiction. The conjecture was not a legally valid basis to start the cancellation process, because a failure to vote cannot trigger the initiation of a cancellation process.

73.    The policy recommended by the former AVID Supervisor and ultimately implemented by the Borough and Central Offices identified voters for cancellation based solely on a failure to vote and not having any other voter activity in AVID since 2008. This policy and

15

practice clearly violated the federal and state law prohibitions against initiating the cancellation of voter registrations and ultimately cancelling such registrations due to a failure to vote. *See* 52 U.S.C. § 20507(b)(2); N.Y. Elec. Law § 5-400(1).

74.     Indeed, the plan did not require staff at the Brooklyn Borough Office to find any evidence indicating that the voters were ineligible pursuant to federal or state law. *See* N.Y. Elec. Law § 5-400(1); 52 U.S.C. § 20507.

75.     Upon information and belief, in late 2013 or early 2014, the Chief Clerk of the Brooklyn Borough Office spoke with and received approval from at least one of the two Brooklyn Commissioners prior to moving forward with implementation of the Brooklyn Project.

### iii.        Brooklyn Borough Office Flags Voters for Cancellation

76.     In the first step of implementing the Brooklyn Project, staff at the Brooklyn Borough Office improperly identified or "flagged" for cancellation those voters who had not voted since 2008.

77.     The flagging process began in early 2014, when the Chief Clerk requested a list of all registered voters in Brooklyn from the NYCBOE's information technology department, known as the Management Information Systems Department ("MIS"). MIS is co-located at the Central Office in Manhattan with the Executive Management and other Central Office staff.

78.     Upon receipt of the list of registered voters in Brooklyn, the Chief Clerk directed the creation of a second list that included only registered voters who had not voted since 2008 (the "Review List"). The Review List contained at least 120,000 voters. Again, the Brooklyn Borough Office did not rely on any evidence that a voter was legally ineligible to vote in compiling this list.  Rather, in violation of federal and state law, Brooklyn Borough Office staff

16

sought only to identify voters who had not voted or lacked other voter activity listed in AVID since 2008.

79.     The Chief Clerk and other supervisors printed the Review List and distributed it in parts to staff in the Brooklyn Borough Office for processing.

80.     In an interview with the NYAG, the Chief Clerk indicated that Brooklyn Borough Office supervisors provided staff with instructions on how to process the information on the Review List as follows:

        a.      Supervisors directed staff from one major political party to search each voter on the Review List in AVID and determine if the voter had any voter activity since 2008.

        b.      If there was no recent activity in the voter's record, that first staff member would manually mark the voter on the printout using a highlighter or pen.

        c.      Then a staff member from the other major political party would review this finding.

        d.      If the second staff person agreed that there was no recent activity, he or she would "flag" the voter within AVID.

81.     Flagged voters received an "INFO66 ITC letter."

82.     An "INFO66 ITC letter" is similar to other ITC letters used by the NYCBOE in that it informs a voter of the agency's intent to cancel his or her registration, and provides the voter 14 days to respond and avoid cancellation.  However, it is different in that it is the only ITC letter used by the NYCBOE that employs a manual flagging process, as described in ¶ 80(a)-(d), *supra*.  This means, staff at the NYCBOE have discretion to flag which voters will

17

receive an INFO66 ITC letter. In contrast, for all other ITC letters sent by the agency, MIS uses an automated system to flag voter registrations for cancellation based on information provided by specific government agency sources, such as lists of deaths, duplicate registrations, or felony convictions received from New York State, or lists of changes of address received from the USPS. Automatic flagging of voters' registrations that appear on these lists, restricts the discretion of NYCBOE staff to identify or flag which voters' registrations to cancel.

83.     According to an investigative report conducted by MIS after the 2016 presidential primary, staff throughout the Brooklyn Borough Office spent several months flagging voters pursuant to the Brooklyn Project. Specifically, more than 20 different staff members were involved.

### iv.      Central Office Mails ITC Letters and Purges Flagged Voters

84.     In early April 2015, the NYCBOE began working on sending INFO66 ITC letters to voters who were flagged for cancellation by staff in the Brooklyn Borough Office. Staff from MIS compiled a list of 122,485 voters who were flagged as of April 3, 2015 and sent it to the Coordinator of Voter Registration. The Coordinator of Voter Registration works in the Central Office and is responsible for a variety of tasks, including overseeing the Voter Registration Departments in the five Borough Offices and managing most ITC mailings.

85.     By April 9, 2015, the Coordinator of Voter Registration had informed officials in Executive Management, including Executive Director Michael Ryan, that the planned INFO66 ITC letter mailing included more than 120,000 voters in Brooklyn.

86.     Officials in Executive Management, including the Operations Manager, worked with the Brooklyn Borough Office to mail out the INFO66 ITC letters. From April 25, 2015 until

18

May 14, 2015, staff at the Central Office in Manhattan stuffed 111,372 envelopes with letters dated May 26, 2015. Staff from the Central Office Voter Registration Department, the Phone Bank, and the Print Shop aided in the effort, many of whom worked weekends to assist in preparing the INFO66 ITC letters to be mailed. The NYCBOE mailed this first batch of ITC letters prior to May 26, 2015.

87.     After a Special Election held on May 9, 2015, staff in the Brooklyn Borough Office prepared a second batch of INFO66 ITC letters for mailing by June 8, 2015. This batch comprised 11,082 voters flagged to receive an INFO66 who resided in the 11th Congressional District, which was the subject of the Special Election.

88.     The NYCBOE did not include these voters in the first batch of letters because it sought to determine whether any had voted during the Special Election. NYCBOE mailed out the second batch of INFO66 ITC letters after removing any flagged individuals who voted in the Special Election.

89.     A total of 4,658 voters responded to either the May 26, 2015 or the June 8, 2015 INFO66 ITC letters to confirm their eligibility to the NYCBOE.

90.     The NYCBOE cancelled the voter registrations of everyone in Brooklyn who did *not* respond to the INFO66 ITC letter. More than 107,300 voters were removed from the voter rolls by MIS on June 18, 2015, and more than 10,300 were purged on July 5, 2015, for a total of over 117,600 voters.

19

91.    In summary, the timeline of the Brooklyn Project is as follows:



v.    **Senior Officials' Involvement in the Brooklyn Project During the Flagging Process**

92.    During and after the implementation of the Brooklyn Project, officials at the NYCBOE had ample opportunity both to identify the improper criteria used by Brooklyn staff to flag voters for cancellation, as well as to remedy and prevent the purge from disenfranchising any voters. However, throughout 2015 and even leading up to and after the 2016 presidential primary, these officials failed to take appropriate action.

93.    NYCBOE Executive Management permitted BOE staff to flag registrations for cancellation through the use of INFO66 letters without requiring staff to provide any evidence that the registered voter was ineligible to vote. Executive Management failed to sufficiently supervise the use of INFO66 letters by Brooklyn Borough Office staff to ensure that voters were only removed from the voter rolls for legally permissible reasons, e.g., death, conviction for a felony and serving a prison or parole sentence, or adjudication as incompetent.

94.    Senior NYCBOE officials had many opportunities to learn of the illegal criteria

utilized by the Brooklyn Borough Office to cancel voters' registrations and to prevent the Brooklyn Project from moving forward. During the flagging process, officials from Executive Management, Commissioners and the Brooklyn Borough Office held several meetings. Upon information and belief, during some of these meetings, the Chief Clerk discussed the Brooklyn Project and what it entailed.

95.     Upon information and belief, during the flagging process, officials in Executive Management visited the Brooklyn Borough Office to conduct regular oversight. Moreover, during this period, the Chief Clerk met and had discussions with the NYCBOE's Brooklyn Commissioners and Executive Management to provide updates and inform them of developments at the Brooklyn Borough Office.

96.     Notwithstanding this regular contact and reporting, staff in the Brooklyn Borough Office continued to flag voters based solely on voter inactivity, an impermissible criteria under state and federal law, for more than a year.

### vi.     Senior Officials' Involvement in the Brooklyn Project During the Mailing and Purging Process

97.     In addition, officials at the NYCBOE had additional opportunities to identify the illegal criteria and prevent the improper cancellation of 117,000 voters' registrations during the mailing and purging process.

98.     For instance, when MIS extracted the list of voters flagged to receive an INFO66 letter from AVID in early 2015, several individuals noted the high number of affected voters in Brooklyn.  In addition, the Director of MIS later stated during an interview with the NYAG that the numbers were higher than anything he had seen before.  He reported that he did not raise any questions because the Brooklyn Borough Office had a reputation for falling behind in

21

maintaining its registration rolls.  The Director of MIS assumed that the high numbers were related to this lag.

99.    Staff at the NYCBOE Central Office also noted the large number of registrations slated for cancellation. An employee in the Election Day Operations Department tasked with procuring envelopes for the INFO66 letters noted in an email that the proposed mailing was "much larger than previous mailings." Nevertheless, the NYCBOE proceeded with the mailing without reviewing the large number of flagged voters.

100.    Officials in Executive Management were regularly updated throughout the mailing process, but they nonetheless failed to question the unusually high number of registrations scheduled for cancellation in Brooklyn, and did not make any attempt to investigate whether illegal shortcuts taken by the Brooklyn Borough Office had caused the numbers to be so high.

### vii.    Senior Officials' Failure to Remedy the Brooklyn Project in 2015

101.    After the Brooklyn Project was completed, the NYCBOE received questions from within the agency about the large number of cancellations, and from affected voters about the reasons for those cancellations.   Senior officials persistently failed to take any steps to adequately investigate these questions and to ensure that the registrations of eligible voters had not been cancelled.

102.    In a video recording of the NYCBOE Commissioners' Meeting on July 7, 2015, the Executive Director of the NYCBOE, Michael Ryan, reported the number of voters' registrations cancelled by the INFO66 letter to the Commissioners. Brooklyn Commissioner John Flateau then asked why the number of registrations cancelled in Brooklyn was so

22

"inordinately high."

103.    The Director of MIS answered Commissioner Flateau's question by citing to the large "backlog" in maintaining the registration rolls at the Brooklyn Borough Office.  Several additional officials agreed with this explanation, including both the Deputy Executive Director and Executive Director Michael Ryan.  The Deputy Executive Director added that Brooklyn had not cancelled any registrations in a long time and, as a result, the number of ineligible voters on the rolls had built up.

104.    The explanation provided by the Director of MIS and the Deputy Executive Director during the Commissioners' Meeting was inaccurate. In fact, the number of cancelled registrations in Brooklyn was so high because staff at the Brooklyn Borough Office had improperly flagged voters for a failure to vote.

105.    Following the July 7, 2015 Commissioners' Meeting, Commissioner Flateau requested and received a breakdown of the cancelled registrations organized by Assembly District. However, he took no further action upon receipt of that information.

106.    Officials in the Central Office and Executive Management at the NYCBOE had yet another opportunity to remedy the improper cancellations when they investigated an individual voter complaint in August 2015. On August 20, 2015, the Brooklyn Borough Office received a complaint from a voter who was cancelled from the registration rolls after failing to respond to the May 26, 2015 mailing.  The voter stated in a letter that he had never moved from his residence and questioned why he had been sent the INFO66 ITC letter. The complainant's letter was addressed to the then President of the NYCBOE and copied to certain officials in Executive Management, including Executive Director Michael Ryan.

107.    The Chief Clerk and AVID Supervisor in Brooklyn researched the issue and determined that the Brooklyn Borough Office had flagged the voter for an INFO66 letter pursuant to the Brooklyn Project. The AVID Supervisor subsequently emailed the Coordinator of Voter Registration on August 24, 2015, and described in detail the criteria used to flag the voter's registration for cancellation.

108.    Specifically, in the email dated August 24, 2015, the AVID Supervisor stated that in response to the 2013 DOI Report, Brooklyn staff undertook a project to make its records more accurate. The AVID Supervisor further stated in the email that the project involved sending an ITC letter to any voter who "Did not vote in the Presidential Election of 2008; Did not vote in the Presidential Election of 2012; Did not vote in any other primary or general election since 2008; and Had not made themselves known to us in any other way: i.e.: change of name, change of address, request for ID, etc."

109.    On August 25, 2015, the Coordinator of Voter Registration forwarded this explanation by email to the assistant of the Executive Director Michael Ryan, and copied the Executive Director, the Deputy Executive Director, the Administrative Manager, the Director of MIS, and other key officials at the NYCBOE.

110.    In the email dated August 25, 2015, the Coordinator of Voter Registration stated that the forwarded email contained "the reason" that the complainant's registration was cancelled, and thanked the Chief Clerk and AVID Supervisor in Brooklyn. The Coordinator of Voter Registration did not indicate that the criteria to purge voters described in the August 24, 2015 email violated state and federal law by cancelling voters' registrations based solely on a failure to vote or have any other activity in AVID since 2008. Further, she failed to point out that

24

there were no grounds to believe that those voters were ineligible to vote on one of the legally-prescribed grounds, i.e., because they had died, were convicted of a felony and serving a prison or parole sentence, were adjudicated incompetent, or had moved out of New York City.

111.    Upon information and belief, no further action or investigation was taken after the August 25, 2015 email despite the fact that the criteria for flagging and cancellation described in the email clearly violated federal and state law.

112.    None of the NYCBOE officials copied on the August 25, 2015 email responded to ask more questions or suggest additional investigations to determine if the Brooklyn Borough Office had any evidence that the voters were ineligible to vote on any of the statutorily prescribed grounds.

113.    Nor did any NYCBOE officials take any steps to remedy the improper purge and restore the registrations of affected voters prior to the 2016 presidential primary election.

### viii.    NYCBOE's Failed to Communicate the Brooklyn Project to State BOE

114.    Under New York Election Law, the New York State BOE must maintain an accurate statewide voter database of all registered voters in the State.  N.Y. Election Law § 5-614.

115.    Local BOEs, including the NYCBOE, must synchronize their entire registration roll with the New York State BOE's voter database, known as NYSVoter, at least once every 24 hours. N.Y.C.R.R. § 6217.4(b).

116.    Twice a year, in April and November, the New York State BOE publicly reports the total number of registered voters in every county based on the data maintained in NYSVoter.

117.    The NYCBOE failed to synchronize the cancellation of 117,000 voters'

25

registrations in Brooklyn with NYSVoter before the New York State BOE issued its November 2015 report. Thus, the November 2015 report of registered voters in the NYSVoter database still counted the 117,000 Brooklyn purged voters as registered voters. Officials at the NYCBOE did not identify this error until December 2015, and the NYCBOE's records were synchronized with the NYSVoter database shortly thereafter. Subsequently, the April 2016 NYSVoter report reflected the 117,000 cancellations, i.e., the voters' registrations purged as part of the Brooklyn Project were not counted in the April 2016 report of registered voters.

118.    The decrease in the number of voters registered in Brooklyn in the April 2016 NYSVoter report garnered the attention of several local reporters, who queried the NYCBOE about this decrease shortly before the presidential primary on April 19, 2016.

119.    These press inquiries finally prompted the NYCBOE to begin looking into the criteria utilized to cancel registrations in Brooklyn on April 20, 2016, the day after the presidential primary election.

### ix.        Brooklyn Project's Effect on Voters

120.    Although the NYCBOE made efforts to remedy the improper cancellations following the 2016 presidential primary, the Brooklyn Project nevertheless had the potential to disenfranchise voters.

121.    For instance, a special election was held on November 3, 2015 for voters in the 46th Assembly District in Brooklyn to select a new representative for the State Assembly. Between the purges of June 18, 2015, and July 5, 2015, the NYCBOE cancelled the registrations of 5,567 voters in the 46th Assembly District. Had any one of these voters sought to vote during the special election they would not have found their name in the poll book of their poll site, and

the NYCBOE would have deemed any affidavit they submitted invalid.

122.   Similarly, most of the voters in the 60th Assembly District in Brooklyn had the opportunity to vote in a special election on November 3, 2015 to determine the State Senator for their District. A total of 6,657 voters from this District were purged from the registration rolls during the summer of 2015 and, thus, would have been unable to vote in the special election.

123.   Moreover, upon information and belief, many of the more than 117,000 voters purged from Brooklyn's voter rolls were in *active* voter registration status at the time they were flagged by staff in the Brooklyn office, as opposed to inactive status described in ¶¶ 42-45, *supra*. If the NYCBOE had maintained these voters' active status and therefore, their eligibility to vote through April 2016, their names would have been included in poll books at their poll sites. Thus, they would not need to cast ballots by affidavit at their poll sites.

124.   Upon information and belief, voters who cannot find their registration using the state's online voter database often fail to go to their local poll sites and cast affidavit ballots because either they do not believe their vote will count or they think they are no longer eligible to vote.  Similarly, upon information and belief, voters who cannot locate their names in the poll book of their poll site often choose to leave without casting an affidavit ballot. The improper purge created inaccurate information that, in turn, may have deterred some voters from casting affidavit ballots.

**B.   Manhattan and Queens Borough Offices' Practice of Cancelling Registrations For Failing to Vote**

125.   The Brooklyn Borough Office was not alone in flagging voters for cancellation based on a failure to vote. Other Borough Offices have engaged in similar conduct.

126.   Upon information and belief, staff in the Queens and Manhattan Borough Offices

27

have improperly flagged voters for an INFO66 letter based solely on those voters' failure to vote and without any evidence that the voters were ineligible to vote for one of the legally permitted grounds for cancellation, i.e., they were dead, convicted of a felony and imprisoned or on parole, adjudicated incompetent, or moved out the jurisdiction since at least 2014. The Manhattan and Queens Borough Offices subsequently cancelled those registrations.

127.    In an email to the Chief Clerks of the other Borough Offices, the Chief Clerk of the Queens Borough Office acknowledged the practice of cancelling voters' registrations for failure to vote. On July 9, 2014, the Chief Clerk of the Queens Office emailed her colleagues in the other four boroughs and stated that in reviewing voter registrations, she occasionally finds "a voter that has not voted in a long time." She then offered to send ITC letters to those voters on behalf of the other Borough Offices.

128.    The Chief Clerk of the Queens Borough Office's offer to send ITC letters to a voter who "has not voted in a long time" is a blatant violation of the NVRA and New York State law as voter inactivity cannot trigger the process to cancel a voter registration, nor can voter inactivity ever be the sole basis to cancel a registration.

129.    As of August 2016, officials in Executive Management were aware that Queens and Manhattan Borough Offices had engaged in such activities and had begun investigating the scope of these cancellations.

## IV.    The Purges of Voters From the Registration Rolls Based on a Suspected Change of Address

130.    In addition to the Brooklyn Project, *see supra* ¶¶ 62-100, and the Manhattan and Queens purges, *see supra* ¶¶ 125-128, in 2014 and 2015, the NYCBOE developed and implemented a second unlawful policy and practice of removing voters from its registration rolls

by improperly shortcutting mandated procedures for cancelling registrations based on information received from the NCOA database. Execution of this prohibited policy and practice resulted in two additional large purges of voters from the registration rolls.

131.   Specifically, instead of sending the legally required "Confirmation Letters" to those voters who they suspected had moved outside New York City based on evidence received from the NCOA database, *see supra ¶* 39(a)-(b), the Central Office officials unlawfully sent ITC letters to these voters and then afforded those voters only 14 days to respond or risk cancellation.

132.   By law, when the NYCBOE receives evidence that voters have moved outside New York City, it must first send a Confirmation Notice to these voters, place the voters in "inactive status," and then afford these voters a significantly longer period to respond and confirm their continued eligibility, namely the two- to four-year period covering two successive general federal elections. *See supra* ¶ 39(a)-(b); N.Y. Elec. Law §5-708(5)(c); 52 U.S.C. § 20507(d)(1).

133.   As a result of its unlawful policy and practices, the NYCBOE improperly cancelled over 100,000 voter records and, ultimately, disenfranchised many eligible voters.

**A.     The 2014 Purge of Voters' Registrations Using the NCOA Database**

134.   In May 2014, NYCBOE received a file of all individuals in New York City who had a change of address recorded in the NCOA database. This included voters in all five boroughs of New York City.

135.   MIS analyzed the file to identify voters who had allegedly changed their address to a location outside New York City. MIS identified approximately 60,000 such voters across the five boroughs.

136.    On May 28, 2014, an MIS employee authorized to process this information moved these voters into inactive status in the AVID voter registration database. On July 3, 2014, that same MIS employee emailed the Coordinator of Voter Registration to suggest that Confirmation Notices be sent to the voters.

137.    The steps taken and recommended by this MIS employee complied with federal and state law; namely, the NYCBOE is required to provide a Confirmation Notice and place in inactive status any voter who it suspected had relocated outside its jurisdiction based on evidence obtained from the NCOA database. N.Y. Elec. Law § 5-708(5)(c). Under federal and state law, Confirmation Notices inform voters that they must confirm their continued eligibility within a period stretching over two successive federal general elections or risk cancellation. N.Y. Elec. Law §§ 5-402(2); 5-712; 52 U.S.C. § 20507(d)(1).

138.    However, on July 10, 2014, the Coordinator of Voter Registration informed the MIS employee that the NYCBOE planned to send ITC letters to these voters as the first and only step prior to cancellation of their registration.

139.    The NYCBOE's action in sending ITC letters, and not Confirmation Notices, violated federal and state law. As described above, the ITC letter affords recipients only 14 days to respond or be cancelled, unlawfully abbreviating the length of the cancellation process.

140.    The MIS employee accurately responded to the Coordinator of Voter Registration:



141. Notwithstanding this warning, the NYCBOE proceeded with its plan to send ITC letters rather than Confirmation Notices. Specifically, on July 21, 2014, the NYCBOE sent ITC letters to approximately 61,888 voters in all five boroughs who were identified, using the NCOA database, as possibly having changed their address to a location outside New York City.

142. On August 6, 2014, just over 14 days later, the 60,631 voters from all five boroughs who did not respond to the ITC letter were purged from the NYCBOE's list of eligible voters.

143. The Coordinator of Voter Registration oversaw this process and sent regular updates about it to officials in Executive Management.

144. This purge affected voters whose registrations should not have been cancelled. For instance, one voter in Manhattan, who first registered in August 2004 and voted in every subsequent presidential election, learned during the 2016 presidential primary that the NYCBOE had cancelled her registration. The file from the NCOA database processed by the NYCBOE in

2014 stated that she had moved without any forwarding address.  However, she had not moved since 2012. The NYCBOE improperly sent her an ITC letter on July 21, 2014 and cancelled her registration on August 6, 2014. As described in ¶ 39(a)-(b) *infra*, this action violated federal and state election law which requires the NYCBOE to first place the voter in inactive status, send the voter a Confirmation Notice, and then give the voter a period stretching over two successive federal general elections to confirm her continued eligibility. During the 2016 presidential primary, when she could not find her name in the poll book at her poll site, this voter filed an affidavit ballot. The NYCBOE deemed that ballot invalid based on the improper purge in 2014. If the NYCBOE had followed federal and state law, this voter's affidavit would not only have re-activated her wrongly cancelled registration but the NYCBOE would have deemed the affidavit ballot as valid.

145.    Similarly, another voter in Manhattan learned during the 2016 presidential primary that she was no longer registered. This voter had originally registered in Brooklyn in February 2011 and voted in the 2012 general election. In 2013, she moved to Manhattan and changed her address with the USPS. However, the 2014 NCOA file sent to the NYCBOE recorded that she had changed her address from her Manhattan location without any forwarding address. This was inaccurate as she had not moved since 2013. Nevertheless, the NYCBOE sent this voter an ITC letter on July 21, 2014 and cancelled her registration on August 6, 2014. This voter left her poll site during the 2016 presidential primary without casting an affidavit ballot when she did not find her name in the poll book.

146.    The experiences of these voters were not isolated. On August 13, 2014, an employee at the Staten Island Borough Office emailed the NYCBOE Coordinator of Voter

Registration, noting that she had been receiving calls from voters with recently cancelled registrations in the following situation: although their primary residence was in Staten Island, they had homes in other states and had "put in a temporary change of address with the post office to have their mail forwarded to them." She noted that the registrations of these voters were nevertheless cancelled and they had to re-register.

147.    The Coordinator of Voter Registration responded that the issue was "something the voter must take up with the Post Office."

**B.      The 2015 Purge of Voters' Registrations Using the NCOA Database**

148.    In 2015, the NYCBOE again planned to send ITC letters to voters who it suspected had moved outside New York City based on information obtained from the NCOA database.

149.    In May 2015, the same MIS employee who processed the 2014 file was charged with processing the 2015 file. He again voiced his opposition to the planned ITC mailing, telling a colleague:



150. By May 30, 2015, the NYCBOE had identified 43,635 voters who the NCOA claimed had changed their address to a location outside New York City. MIS marked these voters as inactive in AVID.

151. However, rather than sending these inactive voters Confirmation Notices, as required by federal and state laws, the Coordinator of Voter Registration followed the NYCBOE's policy and practice by sending ITC notices to these voters on June 22, 2015.

152. On July 11, 2015, the NYCBOE purged 43,565 of these voters.

153. Again, this purge affected the registration of voters which should not have been cancelled. A voter in Brooklyn learned during the 2016 presidential primary that her registration had been cancelled by the NYCBOE. This voter originally registered in 2004 and voted in every federal general election since 2008, including the 2014 general election. The 2015 NCOA file mistakenly claimed that she had moved out of state, which led the NYCBOE to send her an ITC letter on June 22, 2015 and cancel her registration on July 11, 2015. This voter submitted an affidavit ballot at her poll site during the 2016 presidential primary, but the NYCBOE deemed it invalid. However, that voter's affidavit ballot would have been counted had the NYCBOE followed proper procedures and kept her in inactive status for two successive federal elections.

154. Similarly, a voter in the Bronx was sent an ITC notice on June 24, 2015 after the NYCBOE reviewed information from the NCOA file that suggested that he had moved out of the state, and his registration was then cancelled on July 11, 2015. However, this voter continued to reside in the Bronx. Moreover, he had been registered since September 1995 and voted in every federal general election since at least 2000, including the 2014 general election. During the 2016 presidential primary, this voter cast an affidavit ballot at his poll site that was later deemed

invalid. This voter's affidavit ballot would have counted had the NYCBOE kept him in inactive status for two successive federal elections, as required by law.

155.    The timelines for the two NCOA purges are as follows:



| **May 2014** | **May 28, 2014** | **July 21, 2014** | **August 6, 2014** |
|---|---|---|---|
| NYCBOE receives file of voters that may have changed their address on NCOA database | MIS places over 60,000 voters identified from NCOA file in "inactive" status | NYCBOE sends ITC letters to 61,888 voters identified from the NCOA file | NYCBOE cancels 60,631 voters that did not respond to ITC letters |

| **May 2015** | **May 30, 2015** | **June 22, 2015** | **July 22, 2015** |
|---|---|---|---|
| NYCBOE receives file of voters that may have changed their address on NCOA database | MIS places over 43,000 voters identified from NCOA file in "inactive" status | The NYCBOE sends ITC letters to over 43,000 voters | NYCBOE cancels 43,565 voters that did not respond to ITC letters |

## V.    NYCBOE Failure to Provide Adequate Oversight and Training to Borough Offices on the Maintenance of Voter Registration Rolls

156.    The implementation of illegal purges by staff both at the Borough Offices and in the Central Office resulted not only from improper efforts to maintain registration rolls, but also from inadequate training and oversight of staff throughout the NYCBOE.

157.    The Commissioners and Executive Management of the NYCBOE failed to provide Central and Borough Office staff members as well as members of MIS with regular, adequate training regarding their obligations to comply with the maintenance requirements for registration rolls prescribed by federal and state laws.

158.    During interviews with the NYAG, several officials from the Brooklyn Borough Office, including the former Chief Clerk, two former Deputy Clerks, and two former AVID

Supervisors, stated that they had received no formal training to perform tasks related to proper maintenance of the registration rolls.

159.    The former Deputy Clerk of the Brooklyn Borough Office reported to the NYAG that when she first started working at the NYCBOE, she had called an official in the Human Resources Department to obtain training, but was told that none existed.

160.    Officials in the Central Office similarly reported to the NYAG that they did not receive formal training on proper procedures for maintenance of the registration rolls.

161.    Staff in MIS stated to the NYAG that they did not receive formal training, and only learned about election procedure on the job. Similarly, the Coordinator of Voter Registration reported to the NYAG that she never received any formal training on permissible procedures for maintaining the registration rolls.

162.    Staff at the Central and Borough Offices also reported to the NYAG that they were unfamiliar with any written procedures or guidelines to help employees understand their legal obligations with respect to the maintenance of registration rolls.

163.    The Coordinator of Voter Registration reported during an interview with the NYAG that she had never received any guidelines on cancellation procedures.

164.    Similarly, staff in MIS stated that they are provided a copy of the New York State Election Law to consult with respect to proper procedures. However, they do not receive any training regarding the procedures contained therein.

165.    The NYCBOE has created a set of written procedures to aid staff in the Borough Offices with the use of the electronic voter database, AVID, as well as the maintenance of the registration rolls. However, during interviews with the NYAG, NYCBOE officials, including the

36

former Deputy Clerk, were unable to recognize the document. The former Chief Clerk recognized the document but stated that she did not consult it.

166.    As a result of these failures to adequately train and provide guidance to staff both in the Central and Borough Offices, staff throughout the NYCBOE misunderstood their legal obligations with respect to maintaining the registration rolls.

167.    For instance, in interviews with the NYAG, staff at the Brooklyn Borough Office, including the former Chief Clerk and two former Deputy Clerks, inaccurately stated that voters could be removed from the registration rolls based on a failure to vote over a long period of time.

168.    Moreover, the NYCBOE lacks an adequate system, process, and procedure to monitor or otherwise oversee registration rolls across all five boroughs in New York City to ensure uniformity and compliance with federal and state election law. This includes failing to audit lists of voters who are flagged to be removed from the voter rolls in order to determine if the removal complies with federal and state election law.

169.    In the past, the NYCBOE employed some limited oversight mechanisms, such as visits by senior officials at the NYCBOE, including Executive Management and Commissioners, to the Borough Offices; meetings between those officials and the Clerks at the Borough Offices; and email updates from the Borough Offices to officials at the Central Office.

170.    However, officials in the Brooklyn Borough Office, including the former Chief and Deputy Clerks, reported in interviews that, beginning in 2014, Executive Management and Commissioners did not hold regular meetings with the Borough Office. In fact, they reported that they did not regularly report to Central Office staff.

171.    Moreover, even when officials from NYCBOE engaged in helping to mail the

ITC letters resulting in the unlawful purges, as they did intermittently through 2015, they nevertheless failed to confirm whether these tasks were in compliance with the law. The NYCBOE officials also failed to identify the illegal Brooklyn Project. *See supra* ¶¶ 94-96.

172.    Further, although the NYCBOE Executive Management was aware that the DOI Report criticized the NYCBOE's voter roll maintenance practices and recommended that these practices be improved, Executive Management failed to review the process by which Brooklyn or the other Borough Offices implemented reforms in response to the Report.

173.    As a result of the NYCBOE's failure to provide adequate training and oversight of staff at the Borough Offices citizens were unlawfully removed from the voter rolls.

174.    Unless enjoined by this Court, this deficient oversight and lack of training is likely to result in the same or similar unlawful removals of voters from the voter rolls in the future.

## CLAIMS FOR RELIEF

### First Cause of Action
**Declaratory and Injunctive Relief Against All Defendants for
Violations of the National Voter Registration Act, 52 U.S.C. § 20507(b)**

175.    The NYAG re-alleges and incorporates by reference the allegations in the foregoing paragraphs of this complaint as fully set forth herein.

176.    The NVRA, 52 U.S.C. § 20507(b), provides in relevant part that any "program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office shall not result in the removal of the name of any person . . . by reason of the person's failure to vote."

177.    Through their actions and inactions, as set forth above, the Defendants

38

implemented an unlawful policy and practice of removing the names of persons from the list of eligible voters by reason of those persons' failure to vote, and then failed to take appropriate action on behalf of voters affected by these policies and practices.

178.    Defendants disenfranchised voters by preventing some voters from casting valid ballots in elections, and by chilling efforts to vote by others, thus violating the fundamental right to vote of thousands of individuals.

179.    As a result of Defendants' violations of the NVRA, affected voters have suffered disenfranchisement and the loss of opportunities to exercise their fundamental rights.

180.    The NYAG seeks declaratory and injunctive relief remedying these ongoing systemic violations.

**Second Cause of Action**
**Declaratory and Injunctive Relief Against All Defendants for**
**Violations of the National Voter Registration Act, 52 U.S.C. §§ 20507(c)(1)(B)(ii) and**
**20507(d)(2)**

181.    The NYAG re-alleges and incorporates by reference the allegations in the foregoing paragraphs of this complaint as fully set forth herein.

182.    The NVRA, 52 U.S.C. § 20507(c)(1)(B)(ii), when change of address information provided by the USPS indicates that a voter has moved outside a registrar's jurisdiction, the registrar must use the notice procedure described in 52 U.S.C. § 20507(d). That procedure permits cancellation of voter's registration if he or she "has failed to respond to a [Confirmation Notice] and has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice."

183.    Through their actions and inactions, as set forth above, the Defendants carried out an unlawful policy and practice of removing persons from the list of eligible voters 14 days after sending notice to the voters, rather than providing those voters the opportunity to confirm their continued eligibility to vote over two successive federal general elections before cancelling their registrations, and then failed to take appropriate action on behalf of voters affected by the policy and practice.

184.    Defendants disenfranchised voters by preventing some voters from casting valid ballots in elections, and by chilling efforts to vote by others, thus violating the fundamental right to vote of thousands of individuals.

185.    As a result of Defendants' violations of the NVRA, affected voters have suffered disenfranchisement and the loss of opportunities to exercise their fundamental rights.

186.    The NYAG seeks declaratory and injunctive relief remedying these ongoing systemic violations.

### Third Cause of Action
### Declaratory and Injunctive Relief Against All Defendants for
### Violations of the New York State Election Law § 5-400(1)

187.    The NYAG re-alleges and incorporates by reference the allegations in the foregoing paragraphs of this complaint as fully set forth herein.

188.    New York State Election Law § 5-400(1) provides the various grounds by which local BOEs can cancel voter registrations and does not permit cancellation solely because the individual has not voted.

189.    Through their actions and inactions, as set forth above, the Defendants implemented an unlawful policy and practice of removing persons from the list of eligible voters

because those persons did not vote, and then failed to take appropriate action on behalf of voters affected by the policy and practice.

190.   Defendants' conduct disenfranchised voters by preventing some voters from casting valid ballots in elections, and by chilling any effort to vote by other voters.

191.   As a result of these Defendants' violations, affected voters have suffered disenfranchisement and loss of opportunities to exercise their fundamental rights.

192.   The NYAG seeks declaratory and injunctive relief remedying these ongoing systemic violations.

**Fourth Cause of Action**
**Declaratory and Injunctive Relief Against All Defendants**
**for Violations of the New York State Election Law §§ 5-708(5)(c) and 5-400(1)(f)**

193.   The NYAG re-alleges and incorporates by reference the allegations in the foregoing paragraphs of this complaint as fully set forth herein.

194.   Under New York State Election Law § 5-708(5)(c), when change of address information provided by the USPS indicates that a voter has moved outside a local BOE's jurisdiction, the local BOE must send the voter a Confirmation Notice and place him or her in inactive status.

195.   Under New York State Election Law § 5-400(1)(f), the registration of a voter in inactive status may be cancelled if they "did not vote in any election conducted by the board of elections during the period ending with the second general election at which candidates for federal office are on the ballot after his name was placed in inactive status and for whom the board of elections did not, during such period, in any other way, receive any information that such voter still resides in the same county or city."

41

196.    Through their actions and inactions, as set forth above, the Defendants engaged in an unlawful policy and practice of removing persons from the list of eligible voters 14 days after sending them a notice, rather than providing those voters with the opportunity to confirm their continued eligibility to vote over two successive federal elections.

197.    Defendants' conduct disenfranchised voters by preventing some voters from casting valid ballots in elections, and by chilling any effort to vote by others.

198.    As a result of Defendants' violations, affected voters have suffered disenfranchisement and loss of opportunities to exercise their fundamental rights.

199.    The NYAG seeks declaratory and injunctive relief remedying these ongoing systemic violations.

### REQUESTS FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests that the Court:

a.    Assume jurisdiction over this matter;

b.    Declare that Defendants' acts and omissions violated the NVRA and the New York State Election Law;

c.    Enjoin Defendants, their agents and successors in office, and all persons acting in concert with them from future non-compliance with the NVRA and New York State Election Law;

d.    Enter permanent injunctive relief, in the form of:

1.    An order requiring Defendants to audit the cancellation of registrations for every New York City voter sent an INFO66 or NCOA ITC letter since January 1, 2014, and requiring reinstatement of any person removed in violation of federal or

state election law;

2.      An order requiring Defendants to take affirmative steps to ensure that a process for cancelling voters' registrations is implemented in compliance with the NVRA and New York State Election Law;

3.      An order requiring Defendants to create a training program, with the approval of the NYAG, regarding the maintenance of registration rolls and the removal of voter registrations from the list of eligible voters;

4.      An order requiring Defendants to create oversight policies to ensure Borough Offices' compliance with federal and state law regarding registration cancellations;

5.      An order enjoining Defendants from using INFO66 ITC letters to cancel voters' registrations without documentation or evidence that a voter is ineligible;

6.      An order requiring Defendants to appoint a new head of Voter Registration with the responsibilities of providing oversight of cancellation processes and ensuring that such processes comply with federal and state law; and

e.      Grant any other relief the Court deems necessary and proper.

Respectfully submitted,
**ERIC T. SCHNEIDERMAN**
Attorney General of the State of New York

By:

_____

Lourdes M. Rosado,\* Bureau Chief
Sania Khan, Assistant Attorney General
Diane Lucas, Assistant Attorney General
Ajay Saini,\* Assistant Attorney General
Civil Rights Bureau
Office of the New York State Attorney
General
120 Broadway
New York, New York 10271
Tel.     (212) 416-6438
Fax     (212) 416-8074
*Admission to the EDNY pending.*

Dated: January 26, 2017
       New York, NY

44